1

2

3

4

5

6

7

8                   UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   PAUL MOORE,                              Case No.  2:18-cv-1699-DC-JDP (P)

12              Petitioner,

13        v.                                  FINDINGS AND RECOMMENDATIONS

14   SCOTT FRAUENHEIM,

15              Respondent.

16

17        Paul Moore ("petitioner") seeks a writ of habeas corpus under 28 U.S.C. § 2254.  ECF No.

18   2?.  He was convicted of first-degree murder.  *Id.* at 3.  His conviction was affirmed by the state

19   appellate court in November 2016 and the California Supreme Court denied his petition for

20   review in March 2017.  *Id.*  He filed this petition on June 8, 2018.  Alongside this petition,

21   petitioner filed a state habeas petition in the Colusa County Superior Court on June 4, 2018.  That

22   petition was denied, after two evidentiary hearings, on August 19, 2022.  ECF No. 50 at 9-10.

23   Subsequent state habeas petitions in the state appellate court and California Supreme Court were

24   also denied.  *Id.* at 10.  In the immediate petition, petitioner argues that he is entitled to habeas

25   relief because: (1) his trial and appellate counsel rendered ineffective assistance; (2) insufficient

26   evidence supports his conviction; and (3) cumulative error warrants reversal.  Respondent has

27   filed an answer, ECF No. 50, and petitioner has filed a traverse, ECF No. 53.  For the reasons

28   stated hereafter, the petition should be denied.

                                              1

1

**Background**

2          I have reviewed the background summary articulated by the state appellate court on direct

3    appeal.  It is correct, and I reproduce a portion of it here for factual context:

4                A jury convicted defendant Paul Roger Moore of first degree
             murder based exclusively on circumstantial evidence that he built
5            and planted a victim-activated bomb in an irrigation pump he knew
             the farm foreman and eventual victim, Roberto Ayala, would
6            activate.  Paul insists it was his first cousin Peter who had the
             motive and violent disposition to murder Roberto, a man who had
7            claimed his father's and uncle's affection and devotion.  Paul's
             narrative of family intrigue has all the earmarks of a Shakespearean
8            tragedy and makes for compelling drama.

9                . . .

10               ROBERTO'S DEATH AND THE MOORE FAMILY TRAGEDY

11               On July 16, 2011, Roberto [Ayala] picked up his seven-year-old
             son, bought him lunch, and drove to one of the Moore brothers' rice
12           fields to adjust the irrigation pump.  His son heard a loud explosion
             and saw his father on fire.  He ran to help him, but his father was
13           unresponsive.  He could not retrieve his father's cell phone because
             his father was on fire.  He ran for about two miles to get help.
14
                 Roberto Ayala died instantly from an explosive device that he
15           unknowingly detonated at chest level.  His body was still burning
             when the firefighters arrived.  There were pieces of metal shrapnel
16           in his chest, neck, and brain.  The perforating shrapnel- or
             fragment-related injuries occurred immediately before the fire-
17           related injuries.  The forensic pathologist who performed the
             autopsy opined that the cause of death was explosive shrapnel
18           injuries and high-voltage electrocution.

19               But the fire and law enforcement officials who performed the initial
             investigation did not know a bomb had been planted in the
20           irrigation pump.  Their investigation focused on whether the
             explosion was an accident.  The first responders believed Roberto's
21           truck had been moved because the broken glass was located about
             11 feet away and a piece of glass was in the rear tire tread.
22
                 Roberto's death occurred against the backdrop of great family
23           disharmony and dissension between the two principals in this
             deadly drama, Peter and Paul, cousins whose fathers were the sons
24           of Richard and "Mimi" Moore, owners of an 1,800-acre farm near
             Colusa.
25
                 Neither cousin was happy with his place within the family
26           hierarchy.  Peter insists that on his deathbed his grandfather
             expressed his desire for Peter to farm the walnut orchards.  But
27           abused and ostracized by his father Gus, whom family members
             called "Grumpy," Peter was not allowed to farm and instead spent
28           21 years earning a living in a landscape business he apparently

loathed at times. He had been angry and upset with the Moore family since he was 12 years old. Peter tried to convince his grandmother Mimi to disinherit his father, confident that his Uncle Roger would be more fair. On several occasions, he physically threatened to harm, among others, his father, his uncle, and Roberto Ayala. Indeed, shortly before the explosion, Roberto had injured his shoulder and Peter declared that "[w]hen his wing is better, he's all mine." He was upset that Roberto spent Father's Day with Gus and that they were together all the time.

Paul is Roger's son. Paul appears to have suffered more quietly than his cousin. But in a document entitled My Life that he stored on his computer, Paul complained bitterly about his life growing up on the farm. He felt mistreated by everyone, including Peter. During tomato harvest, he wrote, he drove the "shitty" tractor, but "pussy" Peter was allowed to drive the tractor with an air-conditioned cab because otherwise Peter was a "prick to work with." Employees, including Roberto Ayala and Roberto's brother Eduardo, were given liberties he was not, such as drinking on the job, taking farm vehicles and equipment for personal use, and getting paid during the winter. Meanwhile, he was treated worse than any employee, worked harder, but was never given a raise. He wrote that his father thought he was stupid, but continually raved about Roberto's intelligence. In describing his life, he pondered what he had done to be treated so poorly by his own family.

While Peter and Paul have very different dispositions, they share similar grievances and similar life trajectories. Clearly, they both had hoped to assume managerial positions on the farm. Their hopes had not materialized. They attempted other ventures that failed— Paul in construction, Peter in starting a sod business. Both suffered physically. Paul injured his back and had to give up construction. Peter had his stomach removed and lost almost 50 pounds.

Most significantly, they shared their animosity toward Roberto Ayala. Roberto had worked for the Moore brothers for 19 years. He was the farm foreman. He was responsible for regulating the water levels on the rice fields. Clearly, over the years he earned the trust and respect of Roger and Gus. There were disagreements where Roger took Roberto's advice over that of his son or nephew. For example, Roberto traveled with Peter to a seminar about operating a sod business, but when Peter expressed interest in purchasing a harvester, Roberto alerted Roger, and Roger disapproved of the purchase. Similarly, when Roberto and Paul disagreed about a design for a mud chisel, Roberto's idea garnered Roger's blessing. Paul complained that Roberto was accorded special privileges, such as keeping sheep and goats by the farm workshop, drinking beer while working or after work, and driving company vehicles home. According to Peter, the Ayala brothers agitated Paul and he remarked, "Those son-of-a-bitches, they are trying to take over my life. I'm going to get that F'er." Peter testified that Paul was severely depressed and he was afraid he was suicidal.

1  ECF No. 51-20 at 1-4.

2  **Discussion**

3  **I.    Legal Standards**

4  A federal court may grant habeas relief when a petitioner shows that his custody violates

5  federal law.  *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75

6  (2000).  Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty

7  Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition.  *See Harrington v. Richter*,

8  562 U.S. 86, 97 (2011).  To decide a § 2254 petition, a federal court examines the decision of the

9  last state court that issued a reasoned opinion on petitioner's habeas claims.  *See Wilson v. Sellers*,

10  138 S. Ct. 1188, 1192 (2018); *Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003) ("Because,

11  here, neither the court of appeal nor the California Supreme Court issued a reasoned opinion on

12  the merits of this claim, we look to the trial court's decision."); *McCormick v. Adams*, 621 F.3d

13  970, 975-76 (9th Cir. 2010) (reviewing the decision of the court of appeal, which was last

14  reasoned decision of a state court); *Gill v. Ayers*, 342 F.3d 911, 917 n.5 (9th Cir. 2003) ("Because

15  the California Supreme Court denied review of Gill's habeas petition without comment, we look

16  through the unexplained California Supreme Court decision to the last reasoned decision . . . as

17  the basis for the state court's judgment.") (internal quotations omitted).

18  Under AEDPA, a petitioner may obtain relief on federal habeas claims that have been

19  "adjudicated on the merits in state court proceedings" only if the state court's adjudication

20  resulted in a decision (1) "contrary to, or involved an unreasonable application of, clearly

21  established Federal law, as determined by the Supreme Court of the United States" or (2) "based

22  on an unreasonable determination of the facts in light of the evidence presented in the State court

23  proceeding."  28 U.S.C. § 2254(d).

24  **II.    Analysis**

25  **a.    Sufficiency of the Evidence**

26  Petitioner argues that insufficient evidence supports his guilty verdict.  The state court of

27  appeal rejected this claim:

28

4

1

2

3

4

5

There was no direct evidence of who designed, constructed, or placed the explosive device. There were no eyewitnesses, no confessions, no admissions, and no fingerprints or DNA evidence found on any of the parts of the explosive device found at the scene of the murder. Defendant insists there is no substantial evidence that he murdered Roberto Ayala, and the weak circumstantial evidence of his guilt is insufficient to sustain the verdict in the context of the more compelling evidence that his cousin Peter was the perpetrator.

6

7

8

9

10

11

12

13

14

Defendant does not quarrel with the limited scope of appellate review of an insufficiency claim. He acknowledges, as he must, that our task is to review the whole record in the light most favorable to the jury verdict to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Davis* (2009) 46 Cal.4th 539, 606 [94 Cal. Rptr. 3d 322, 208 P.3d 78].) We are not at liberty to reweigh evidence or revisit credibility issues. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal. Rptr. 2d 23, 864 P.2d 103].) If the verdict is supported by substantial evidence, we must defer to the trier of fact; yet a verdict cannot be sustained based on "'suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work.'" (*People v. Morris* (1988) 46 Cal.3d 1, 21 [249 Cal. Rptr. 119, 756 P.2d 843].)

15

16

17

18

19

In sum, there is an abundance of circumstantial evidence that either Peter or Paul, or perhaps Peter and Paul together, built and planted the bomb that killed Roberto Ayala. We will review that evidence in two steps: first, we will outline the evidence of solid, credible value the jury could have reasonably relied upon in finding Paul guilty of murder beyond a reasonable doubt. And second, we will test the substantiality of that evidence in light of the entire record, that is to say, in light of the compelling circumstantial evidence that Peter, not Paul, blew up Roberto Ayala.

20

A. Circumstantial Evidence Against Paul

21

1. Opportunity and Familiarity

22

23

Paul returned to work on the farm a few years before the explosion. He took on additional responsibilities as his back healed, and by July 2011 Roger had decided to bring on Paul as a 50 percent partner of his half of the farm operation.

24

25

26

27

During his apprenticeship, Paul worked alongside Roberto. In fact, after Roberto injured his shoulder, Paul accompanied him on occasion to the irrigation pumps to adjust water levels. In early July, Paul was asked to drive out to the rice field to turn on the water pump without Roberto. From this evidence, the jury could reasonably infer that because Paul was familiar with Roberto's routine, he could specifically target Roberto by placing the bomb in an electrical pump panel he knew Roberto would be operating. He

28

was familiar, therefore, not only with Roberto's working routine, but also with the operation of the pump.

## 2. Unique Skill Set

Paul told investigators that his electrical experience was limited to fixing an electrical outlet and that he had no experience working on the pump control panels. According to the testimony offered by his father, his son, and his ex-father-in-law, that was a lie.

Paul's son Gunner testified that when Paul was young, he rewired the light switch in his bedroom so he could turn off the light from his bed, but if a person did not flip the switch in a particular way, he or she would be shocked. Later, as a father, Paul taught Gunner how to hardwire electronics to his car battery so he would not have to use the cigarette lighter to power the electronics in his car. Gunner believed his dad could repair just about anything and could "make something out of nothing." One of Paul's favorite hobbies, according to Gunner, was assembling and flying radio-controlled airplanes.

Gunner also reported that, according to his dad soon after the explosion, his grandfather "feared that there was a booby trap in the switch" and stated that "someone must have been a genius to be able to do that, some type of electrical genius."

Roger attested to his son's aptitude for building things, albeit the examples he cited were not electric. He testified Paul constructed a rice roller and a fertilizer aqua bar in the farm workshop.

Over defense objection, Paul's ex-father-in-law testified that Paul apologized to him for tapping his daughter's telephone when they were going through a divorce, putting some kind of recorder under her modular home so he could monitor conversations. The wiretapping occurred in 1995 or 1996. He also testified that Paul and a friend created an acetylene bomb by combining acetylene gas and oxygen in a balloon. The bomb exploded, injuring Paul and his friend. That explosion occurred in about 1991.

From this evidence, the jury could reasonably infer that Paul had both the aptitude and unique skill set needed to build the type of explosive device that killed Roberto Ayala. To be sure, Paul had demonstrated an advanced mechanical aptitude and an understanding of electrical currents.

## 3. Evidence From the Investigation

July 18: Two days after Roberto Ayala's death, Paul delivered to investigators a piece of metal he found in a canal near the explosion. He pointed out that the markings or threading on the metal indicated to him the explosion was not an accident. According to Paul, something had been placed at the pump to cause the explosion. He told investigators he had operated the panel five days before the explosion, and he drew an accurate picture of the panel.

On that same day, Paul cast aspersions on Peter. The jurors could have found his behavior odd, even calculated to focus the investigators' attention on his cousin. He showed them copies of text messages he had received from Peter in which Peter expressed his displeasure with the condition of the fields and suggested the field manager (Roberto Ayala) should be fired. The investigators would later discover that Paul had deleted individual text messages he had sent to and received from Peter. Paul told the investigators that Peter had been around the explosion site one day before the explosion.

August: On August 11 the investigators were informed that the chemical testing of the fragments from the explosion indicated the presence of nitroglycerine, a chemical used in explosives. This information was not disclosed to the public.

The next day, the investigators at the Colusa County Sheriff's Department received a letter with a postmark from Sacramento that they learned was processed by the postal service in West Sacramento. The delivery and return addresses were printed label strips made with a label maker. Eight stamps were attached for postage. The text of the letter was a photocopy of the original; it too contained printed label strips made with a label maker. The letter read:

"I am responsible for the panel explosion. I am military trained. Expert in Vietnam devices. I received info and instructions via USPS. Name, age, vehicle I.D. and plate number. Location and meter number for panel. First three fuses, the device had dual triggers and detonators. Trig one, vibration activated. Trig two, drop weight activated upon door opening. Two-inch gallon pipe and quart of gasoline in plastic bottle. Upon detonation gas atomized for millisecond, completed the circuit triggering flashover, thus electrocution, fail safe and no disarming. Lab results will be military-grade powder, black spray-painted epoxy, no DNA. This was an MS-13 [Mara Salvatrucha, a violent gang] job, something about a Mexico deal gone wrong.

"Why am I helping u? I received another package via USPS, target two, I will not take this job because the info I received is wrong. I got name, age, vehicle description, plate number and location. The target is brother of target one and drives Chevy. This vehicle info is the same as the first job. White Ford, same plate number. I finally found the Ford, and now it is driven by some young guy, not the brother. Since I will not take this job, it will soon be reassigned. Someone will take it. The next guy might not catch the error in info and the wrong person will die.

"I would decline anyway because I saw target two with his girls and that I can't deal with. Target two knows the Mexico connection and that is the reason 4 relocating n will not help target two. They will find him. He needs to be careful. They gave me two months 4 this job. It will be reassigned in five weeks. Whoever is driving the Ford is very much in danger. This was my first and final job. I am sure MS-13 will figure out I tipped authorities and will soon come

for me.  My house and property are protected, larger devices.  I am over this life.  God [sic] luck.  If u come 4 me, call first.  I will come peacefully or detonate all the devices."

Paul, not Peter, used abbreviations such as "u" and "4" in his text messages.  The investigators did not believe that a Mexican gang was involved in the explosion because gangs typically advertise their involvement rather than hide it, to incite fear and command respect.

On August 15 the investigators received a second letter and a diagram of a bomb.  Like the first letter, the text of the second was made with a label maker and photocopied.  This envelope had a postmark from Colusa.  The letter stated: "Ayala was actually warned what would happen if he screwed with these people.  He has endangered others in his family.  They now want the white Ford F-250 hit.  He thought he was safe in the States.  Previously driven by target one.  They want the brother, but it is now driven by some young guy, or do they want the young guy?  This is why I refused this job, but the next guy might kill both to ensure payment.  Whoever is driving that white F-250 is in great danger.  Another expert will do this job.  The money is good.  After a career of killing, I want to save a life before I take my life.  If u have any questions, place ad in Sac Bee, help wanted, make it the last ad [in the] August 21st issue.  This is the second warning letter I have sent u.  I wanted to make sure u get [sic].  Believe me and have time to do something to help these guys."

One of the investigators described the diagram of the bomb as follows:

"It's a diagram that has writing around the diagram and on the diagram.  The writing is comprised in a similar fashion as the letters themselves.  The actual printing on the diagram looks like somebody printed it on a label maker, affixed it to the paper and then ran it through a photocopier.  There is also freehand drawing on the diagram, and there's also straightedge drawing on the diagram.

"The freehand drawing has some arrows on it.  The straightedge drawing is—the diagram depicts—what we're led to believe is that the diagram depicts the electrical box.  The outside square of the diagram is the electrical box that we've described."

No fingerprints were found on the two letters, and one of the envelopes contained the fingerprints of an unknown person.  Neither Peter's nor Paul's DNA matched swabs taken from the letters, envelopes, and stamps.

On August 17 Paul went to the police station voluntarily.  He denied involvement in the explosion, declaring it was "a chicken shit way for somebody to do it."  As mentioned earlier, he claimed he had little experience with electrical devices and no experience with the irrigation pumps.  He denied saying he would fire the Ayala brothers if he ever took over the farm and insisted he liked

1        Roberto.  He claimed Roberto was a good person but admitted he became upset when he saw Roberto drinking and driving on the

2        farm.

3        On August 18 Paul brought in another fragment he thought was suspicious and indicative of a bomb going off.  He thereafter

4        refused to come back for any additional interviews.

5        On August 22 the investigators searched the farm shop with Roger's permission.  They found threaded pipe nipple, end caps in

6        the form of reducers and plugs, other end caps, washers, nuts, multicolored wire, and seven-inch bolts.  The bolts were just like

7        the bolt discovered at the scene of the explosion.  The washers were consistent with washers used on the spikes that had been laid on the

8        road leading away from the explosion site.

9        September through October: On several occasions the FBI dive team searched the canal and the irrigation ditch perpendicular to the

10      canal and found a fuse, hinge, washers and nuts, the inside part of the electrical control panel, part of the post the panel had been

11      mounted on, and a timer box cover.  On October 3 investigators also found spikes down a private farm road.  Eduardo Ayala told an

12      investigator he saw Paul manufacturing spikes in the farm maintenance shop.

13

November: By November the investigation had targeted Paul.  The

14      investigators placed a GPS (global positioning system) device on his truck, devices that often malfunction.  On November 24 they

15      noticed the device was not working and they went to Paul's house to investigate.  The investigators did not desire to have personal

16      contact with Paul at the time, so when he saw them driving by his house, the investigators drove away from the area.  As they were

17      driving, they noticed Paul's truck behind them.  Paul then drove to the farm shop.  The investigators drove around the block a couple

18      of times and on one occasion had eye contact with Paul.  They observed his vehicle leave the shop and the driver accelerated and

19      eventually passed them at over 90 miles per hour.  The prosecution argued that Paul was attempting to taunt the police.

20

December: On December 6 Paul's house was searched.  A bomb-

21      sniffing dog did not alert on anything explosive in the house, garage, or truck.  The police officers confiscated a laptop computer,

22      a combined printer-copier, a partial roll of stamps similar to those used on the second letter sent to the sheriff, an unopened label

23      maker, file folders that had been marked with labels created with a label maker, and manila envelopes similar to the one used for the

24      first letter.  Most damning, they found a sheet of paper with indentations that appeared to match the diagram of the bomb sent to

25      the sheriff.  They seized this sheet but not the sheets of paper below it.  They also found a rat trap and three mouse traps in the pantry

26      and fishing line in his boat.  A trace evidence examiner testified that the chemical composition of the fishing line found in Paul's boat

27      was indistinguishable from the fishing line wrapped around a bolt found at the scene of the explosion.

28

1

2

3

4

Paul was eventually arrested for the murder of Roberto Ayala. A friend read about his fingerprints on the indented sheet in a local newspaper and asked him about it when he called Paul in jail. Paul said the evidence was no big deal; he said the sheet was found in his house by the window, and he "probably leaned on it and opened the window."

Forensic Analysis

5

6

7

8

9

10

11

12

The forensic testimony provided the most compelling evidence against Paul. The prosecution called a litany of forensic experts connecting Paul to the sheet of paper with the indentations of the bomb diagram, the paper in the printer to the paper used in the diagram of the bomb, the ink in the copier to the ink used on the second letter and the diagram, the type of labels used in the letters and diagram to the type Paul used on his own files, and the fishing line found in his boat to the type of fishing line used in the bomb. Taken together, their expert opinions constitute substantial evidence from which the jurors could reasonably infer that Paul was the author of the incriminating letters to the investigators and that it was the author of those letters with the knowledge of the intricacies of the bomb who must have designed, created, and planted it.

13

14

15

16

17

18

A forensic document examiner compared the sheet of paper with the indentations that had been seized from Paul's residence to the diagram of the bomb mailed to the Colusa County Sheriff's Department. Most of the indented impressions found on the sheet of paper matched the lines in the bomb diagram. He explained that the indented sheet appeared to have been placed beneath the document that was actually written even though some of the lines did not align perfectly. The lack of complete alignment resulted from the diagram or indented sheet being moved, the diagram being drawn at different times, or a line being overwritten. He noted that in a stack of paper, indentations can appear five pages down.

19

Eight fingerprints and the left palm print lifted from the indented sheet of paper matched Paul's.

20

21

22

23

24

A document examiner from the United States Secret Service compared the ink from the documents sent to the sheriff's department with the ink on documents from the printer confiscated at Paul's house. He opined that the second letter and bomb diagram had the same physical, optical, and chemical profiles. In short, he could not tell them apart. He also noted that the second letter, bomb diagram, and indented sheet of paper had comparable levels of sodium, sulfur, and chlorine.

25

26

27

28

A trace evidence examiner found the fishing line recovered from Paul's boat had the same chemical composition as the line around the bolt found at the site of the explosion. She concluded that all the samples came from the same spool or another spool having the same chemical composition and physical characteristics. She also testified the labels on the envelopes sent to the sheriff were consistent with those on Paul's file folders, with the same type of polyester backing and the same type of acrylic-based adhesive. In

her opinion, the labels came from the same tape cassette or from another one with the same characteristics.

An explosive enforcement officer testified that booby trap devices are "victim-operated." He explained that just above the pipe bomb was a "mouse-trap assembly" that was used as a trigger. He described how the booby trap would detonate, as follows:

"So imagine you take a metal box, typical control panel, electrical, that has the lip that goes around, and you have that little washer pin in there so that the lip of the box, I imagine, the door to the box and the box itself has this little washer sandwiched in between them so that it can't fall down. It's leveraged in between there.

"As soon as that door starts to open, that washer is free. Once it gets free enough to the point, and that won't take a whole lot, that washer drops or is free, and then that bolt drops, pulls the line through the first nut on the top, pulls the nut or the line through the bottom nut over here, the second one, which yanks on this little trigger right there releasing the bale. And this would be, in my explanation, it takes a little bit of time, but this is near instantaneously. It's a very rapid event. [¶] . . . [¶]

". . . The bale strikes the nail, and the nail strikes the primer, and this is all happening immediately. And that primer is causing an immediate flash into the cavity of that pipe assembly, the pipe bomb itself, and initiates the explosive charge. The bomb is set off."

The bomb also contained a plastic container filled with gasoline to ignite during the explosion and enhance the thermal effect. Thus the victim, according to the explosive expert, would be injured simultaneously by the explosion and the fire. And because the explosion would be instantaneous, the victim would still be in contact with the electrical panel and would be electrocuted.

In the explosive expert's opinion, the evidence collected from the scene of the explosion was consistent with the diagram of the bomb, including a bolt with the piece of fishing line, pieces of a sprayed-black plastic bottle, plastic wrap, and washers and bolts that might have been part of the bomb. Whoever drew the diagram, he believed, was "intimately familiar with the construction of that device."

The forensic evidence, including the indented sheet of paper with Paul's fingerprints on it, the ink and paper from his printer matching the ink and paper mailed to the sheriff, the matching fishing lines, and the presence in the farm shop of many of the materials needed to make the bomb, constitutes substantial evidence to support the inference the jury made that it was Paul who wrote the letters to the sheriff, and it was therefore Paul who planted the bomb that blew up Roberto Ayala, just as he had planned.

4. Motive

The prosecution need not, as we know, prove motive. (CALCRIM No. 370; *People v. Hillhouse* (2002) 27 Cal.4th 469, 503-504 [117 Cal. Rptr. 2d 45, 40 P.3d 754].)  Nevertheless, motive is relevant, and a strong motive provides powerful evidence.  (*People v. Vereneseneckockockhoff* (1900) 129 Cal. 497, 508 [62 P. 111].)  Here the prosecution sought to prove that Paul disliked Roberto Ayala, believed he was a liability to the farm, and thought that his removal would allow Paul to assume greater managerial responsibilities.  There is indeed sufficient evidence to support a reasonable inference that Paul had nursed a lifetime animosity toward nonfamily members his father appeared to favor.  And Roberto Ayala, in particular, was the target of his wrath.

We have completed one-half of our job by presenting the circumstantial evidence from which the jurors could have reasonably inferred that Paul had the familiarity with Roberto Ayala's work routine and how to operate the irrigation pump as well as the opportunity to plant the bomb and the unique skill set in electrical and mechanical design to have constructed the victim-activated explosive device that killed him.  We have outlined the chronology of the investigation and how it produced evidence that Paul was quick to alert the investigators to evidence suggesting that Peter bore Roberto ill will, that Peter had threatened Roberto, that Peter had been at the scene of the explosion the day before it happened, and that it was an explosion, not an accident.  The forensic evidence, as we have described it, connects Paul to the drafting of the second letter and bomb diagram sent to the sheriff's department.  The indented sheet had his fingerprints all over it, the paper matched paper from his house, the ink matched ink in the printer from his house, the labels matched his labels, and the fishing line attached to the bolt matched fishing line from his boat.  The jury could reasonably have concluded that his conduct following the explosion was incriminatory—manufacturing spikes that were found in the road and taunting the police in a dramatic chase.  And while it may be doubtful that Paul killed the farm's foreman to accelerate his own position given that his father had already decided to partner with him, he certainly felt aggrieved and humiliated that he had been denied the opportunity to become the foreman when he graduated from high school and that, throughout his life, those employees like Roberto Ayala who were not part of the Moore family were valued more and treated better than either Peter or Paul.

Having reviewed the evidence offered by the prosecution, we now turn to the evidence presented by the defense that Peter, not Paul, planted the bomb that killed Roberto Ayala, for he too appeared to disdain the man, he too had the opportunity and familiarity with the irrigation pump, he too had access to the area in which the bomb was planted, and he too had incriminating evidence on his computer hard drive.  In addition, he had a violent disposition and leveled threats to harm not only Roberto, but his father, his uncle, and many others who upset him.  His reputation in the community would make Peter the more likely suspect than Paul.

B. Circumstantial Evidence Against Peter

1. Violent Disposition

There is an abundance of evidence to support the notion that Peter has been a bully his entire life and his relationships have ended poorly.  When asked if his temper had caused problems for him in the community, he testified, "I'm not the easiest guy to get along with."  By his own account, his father not only physically abused him, but from the time he was eight or nine years old made him fight with other boys to resolve their conflicts.  He was a boxer in high school.  As an adult, he became a football coach but was fired for his aggression toward a student.  He was fired as the director of a duck club because he offended some of the members.  And, of course, he was ostracized from the farm and estranged from his father.  He remained so bitter toward his father he begged his grandmother to disinherit him.  The day before the bombing, Peter wrote that an old friend, Bea, had told him she hated his father and "[s]o I think the world of Bea."

According to Consuelo Conedy-Ruiz, the wife of one of the farm workers, Peter intentionally ran over her dog and drove away.  He never apologized, and her husband, Antonio Ruiz, demanded that she not confront him.  Peter told Ruiz and Conedy-Ruiz he did not like Roberto, he was practicing karate to prepare him to fight Roberto, and he referred to Roberto as a "son of a bitch."  In either June or July of 2012 Peter told Ruiz and his wife to forget everything he had told them a year earlier.

Peter loved to shoot ducks.  Many years before the explosion, he set up two duck blinds in a field on the farm.  After a few years, Martin Tucker told Roger that Peter and his friends were shooting every bird in the sky.  As a result, Roger had the duck blinds removed.  Peter was so angry he left a voicemail message for Tucker, threatening that he "was going to rip his head off and piss down his throat" or "shit down [his] neck."  Peter testified that he did not intend to literally rip off Tucker's head, but he did want to engage in a fistfight.  Tucker reported the incident to the sheriff and to Roger.

Peter threatened both his uncle and his father.  He threatened to "beat [his] dad's ass" on multiple occasions.  He also threatened his Uncle Roger, despite the fact he believed Roger would be more fair to him than his father.  Roger made two police reports based on Peter's threats to physically assault him.

Eduardo Ayala testified that he knew Peter characterized him and his coworkers as a lazy group of drug addicts and alcoholics who would ruin the Moore brothers' agricultural business.  He assumed Peter was trying to get him fired.

Most significantly, Peter broadcast his contempt for Roberto.  A month before the explosion, Roger learned from Paul that Peter threatened to injure Roberto.  Peter texted, "When [Roberto's] wing is better, he's all mine."  Peter testified that when he wrote the

message he was planning to beat up Roberto.  Roger encouraged Roberto to seek a restraining order against Peter, but Roberto declined.  Peter testified he was going to physically beat up Roberto.

Peter testified that two months before the explosion, his father told Roberto that if Peter came on the farm, Roberto should have him arrested for trespassing.  He also testified that Paul had told him that Roberto had said he was only good for picking up trash and that Roberto would be receiving Peter's inheritance.  He explained that he had posted a message entitled "Horrible Tragedy" on a sports gambling Web site wherein he described the death of Roberto Ayala.

Peter's best friend, Blane Martin, countered this narrative.  Instead, he agreed that the saying, "Don't let your bulldog mouth let your mockingbird ass get in trouble" applied to Peter.  In other words, Martin believed Peter's "bark is much bigger than his bite."  Martin had never seen Peter actually engage in any sort of violence.

2. Forensic Evidence

Peter's house was searched a few days after the explosion.  He thought the police were there to search for medical marijuana he was growing.  The investigators took possession of three computers and three cellular telephones.  Prosecution experts did not find any evidence of value on Peter's devices.

During trial, however, the defense offered the testimony of an expert in forensic computer analysis.  He discovered what the prosecution experts had all missed—that the user of Peter's computer had visited a YouTube rat trap video.

Roberto's seven-year-old son told the investigators and testified at the preliminary hearing that he did not move or drive the truck after the bomb exploded.  For the first time at trial, however, he testified he got into the truck and tried to drive it.  The defense argued that Peter had been present at the scene of the explosion.

3. Voicemail Messages

On July 17 Roger gave the investigators two voicemail messages he had received from Peter.  In the first message, Peter told Roger that the real reason Roberto's son was fired by another employer was that he was caught stealing and forging his time card, the same thing the "Ayala boys" had been doing to Roger for years.  In the second message, Peter said he had worked for 21 years so he could have a chance to farm; that he wanted his grandfather's farm to stay in the family, but his father had disinherited him; that he and Roger were now "screwed" and he was not going to get a chance to farm; that he had never had a father except biologically; that his father was a "douchebag" and had never given him a penny; that Roger could not see the "Ayala boys over there ripping  [him] off blind"; and that Roberto had his kid driving the harvester.

14

### 4. Aptitude

Peter had difficulty with reading comprehension.  At trial he explained he had difficulty understanding the documents he was asked to review, but that he could understand an oral description of their contents.  Martin opined that Peter was not technically, with regard to electricity, or mechanically talented at all; rather, he was forgetful, had difficulty maintaining the tools he needed for his landscaping business, and suffered minor coordination problems.  For example, Peter's hands shook as he tried to connect PVC (polyvinyl chloride) pipes and install sprinkler systems.  He was able, however, to install electrical sprinkler systems.  Peter testified he was not a trained welder, he was not talented when it came to anything mechanical, and the only electrical work he performed was the simple wiring of electrical sprinkler systems.

### 5. Familiarity and Opportunity

Peter was intimately familiar with the field where Roberto was blown up. In fact, he testified "[t]hat piece of property is my favorite piece of property that we own."  It was in that field that he ran his duck club before Roger took down the blinds.  He dropped his clippings from his landscape business 40 yards from the pump.  And he drove his ATV (all-terrain vehicle) over the field with his friend Blane Martin on a regular basis.  Although he had used the irrigation pump years earlier when he was shooting ducks, the mechanism had been changed and he testified he did not know how to use the new apparatus.

Peter testified it had been 20 days since he had been at the location where the bomb had gone off.  There is no direct evidence that Peter knew Roberto's precise work schedule or routine, but a jury could reasonably infer that he understood that a foreman's responsibility included adjusting the water levels on the rice fields.  Moreover, he was aware of the 19 years Roberto had dedicated to the Moore brothers' farm and had watched at a distance as Roberto ascended to the position he coveted.

### 6. Motive

Motive is one of the elements the defense argued most vehemently.  In Paul's view, it was Peter who had lost the most and had the most to gain by Roberto's demise.  By July 2011 Paul had been reintegrated into the farm and had been promised a partnership with his father.  Roberto was not an impediment to his ambitions.  But Peter's situation was far different.  He had not been allowed to work on the farm for over 21 years.  Gus stood ready to arrest him for trespassing if he was found on the premises.  He did not like Roger and Roger did not like him.  While there is no evidence that he actually had been disinherited, Peter believed he had and that Roberto would be the recipient of his share of the farm.  On July 12, 2011, Peter had texted Paul that he had been landscaping for 21 years, needed to get out, wanted to farm, was trying to get people to talk to Roger, and hoped that Paul would talk to Roger to help him get started farming. Paul therefore argued that he had no motive to

1      kill Roberto, whereas Peter did.  Roberto was Peter's nemesis, and it was Peter, not Paul, who stood to gain the most once he was removed.

2

3      C. Analysis

4      Based on Peter's violent disposition and the threats he leveled at Roberto, among others, the rat trap YouTube video found on his computer, his basic understanding of electrical devices sufficient to enable him to install electric sprinkler systems, his familiarity with the field and with Roberto's responsibilities, his opportunity to plant the bomb, and his compelling motive to remove him from the farm, Paul argued that Peter planted the bomb that Roberto activated when he opened the electrical box to adjust the water levels on the rice field.  He insisted that Peter planted the indented paper and that his fingerprints were left on the top sheet when he placed his hand on it to adjust a window shade.  He stressed that Peter's history of acting out with physical force, coupled with his hatred for Roberto and his lifelong ambition to work his grandfather's farm, constitutes overwhelming evidence that Peter was the murderer.  More to the point, he contends the evidence we described above is not substantial when reviewed in the context of the entire record.  That evidence, Paul argued, pointed to Peter's guilt beyond a reasonable doubt.

Paul was well represented at trial, and his lawyer effectively lodged these arguments, and many more, to the jurors.  The case is a classic whodunit.  And it is particularly challenging because, as Paul argues on appeal, there are no witnesses, no fingerprints on any of the bomb parts, no DNA, no confessions, and no admissions.  The evidence is all circumstantial.  But it is the jury's prerogative, not ours, to weigh the evidence.  The jurors had the opportunity to observe Paul throughout the trial and to assess Peter's credibility throughout his lengthy direct and cross-examinations.  But apparently they had little difficulty reaching their verdict.  They asked for the testimony of only one witness to be reread to them.  Although the trial was lengthy, they took less than a day to deliberate.  Our sole duty, as we wrote at the outset, is only to insure that there is substantial evidence to support the verdict this jury reached.

We have carefully evaluated the quantum and sufficiency of the evidence that it was Paul who murdered Roberto in the context of the whole record, and we have examined each of the pieces of evidence he contends proves that it was Peter who designed, built, and planted the victim-activated explosive device.  The defense raised important questions and offered a more than plausible alternative theory, but those questions were answered by the jury and it rejected Paul's argument that Peter was the perpetrator.  We simply cannot say the evidence that Paul possessed the unique skill set to build a bomb, that he had the requisite familiarity with Roberto's schedule and with the irrigation pump where the bomb was planted, of his fingerprints on the indented sheet that matched the bomb diagram and the remainder of the forensic evidence connecting his printer and his labels with the letter and diagram sent

1
2
3
4
5
6

> by the bomber to the sheriff, and of his suspicious behavior in
> framing his cousin and in manufacturing and planting the spikes in
> the road and chasing the investigators at high speeds, and his
> personal account of the lifetime of disappointment he felt in the
> way he had been treated relative to the way his father and uncle
> doted on Roberto, does not constitute solid evidence of credible and
> reasonable value to sustain the verdict. Simply put, the jury
> concluded beyond a reasonable doubt that based on this evidence,
> Paul was guilty of first degree murder. We must accept its
> determination.

7   ECF No. 51-20 at 4-21. The California Supreme Court subsequently denied the petition for

8   review. ECF No. 51-22. I note that, after this action was filed, the Colunga Superior Court

9   issued a decision that referenced the appellate court's decision and concluded that "the Third

10  District, in rejecting petitioner's claim on appeal that the evidence was insufficient to support the

11  verdict, detailed the plethora of circumstantial evidence regarding the issue of identity of

12  petitioner as the perpetrator." ECF No. 51-24 at 6. It did so in the context of discussing

13  petitioner's claim that the trial court's jury instructions were erroneous, however. *Id.* at 4.

14  Regardless, the analysis that follows remains the same even if this later state habeas decision is

15  considered the "last reasoned decision" for this issue.

16      A federal habeas court cannot overturn a conviction for want of evidence except in the

17  most extreme circumstances. The Supreme Court has held that "the relevant question is whether,

18  after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact

19  could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v.*

20  *Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). A state court's conclusion that a jury's

21  determination met that minimal threshold is entitled to deference under AEDPA. *See Coleman v.*

22  *Johnson*, 566 U.S. 650, 656 (2012) ("The jury in this case was convinced, and the only question

23  under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare

24  rationality. The state court of last review did not think so, and that determination in turn is

25  entitled to considerable deference under AEDPA, 28 U.S.C. § 2254(d).").

26      Here, the jury's determination that petitioner was guilty was not irrational. The state

27  appellate court summarized a substantial amount of evidence that would have allowed a rational

28

finder of fact to conclude that petitioner was guilty.  It noted that substantial forensic expert testimony linked petitioner to the paper bomb diagram and to the incriminating letters.  Petitioner does not dispute that this evidence was incriminating.  ECF No. 45 at 46 ("Nevertheless, perhaps the most incriminating evidence against Paul was the indented paper that resembled the bomb diagram.  When police searched Paul's house almost four months after receiving the bomb diagram in the mail, they found a stack of papers on Paul's desk.").  Petitioner offers an alternate, exonerative explanation, namely that another individual planted the offending evidence at his house.  *Id.* at 46-47.  But such an argument invites exactly the kind of reweighing of evidence that *Jackson* directs against.  That two (or more) conclusions can be inferred from the available evidence does not militate in favor of reversal; it is the prerogative of the jury to weigh the evidence and render a verdict.  A federal habeas court is not a second fact-finder that should weigh the evidence anew and supplant the jury's determination.  In his argument, petitioner relies in part on the Ninth Circuit's decision in *Miller v. United States* for the proposition that "[w]here [two inferences] are equally valid, the defendant is entitled to the one which favors [him]."  382 F.2d 583, 587 (9th Cir. 1967).  But *Miller* is different; in that case, the appellate court concluded that one of the inferences was invalid.  *Id.*  ("We hold that this evidence alone was insufficient as a matter of law to establish Mrs. Joseph's participation in the conspiracy.").  Here, there was sufficient evidence for a rational finder of fact to conclude that petitioner was guilty of the murder, and this claim must be denied.

### b.  Ineffective Assistance of Counsel

Next, petitioner argues that his trial counsel was ineffective because they failed to call (1) a cellular data expert, (2) an automotive expert, and (3) a forensic paper and ink expert.  ECF No. 45 at 32-45.  The Colusa County Superior court rejected petitioner's ineffective assistance claim when it denied his state habeas petition.

The Colusa County Superior court rejected petitioner's ineffective assistance claim:

### 1.  Cellular Data Expert

> By stipulation of the parties at the evidentiary hearing held on March 10, 2022.  Petitioner was allowed to present the declaration of Robert Aguero, a cell site data expert, in lieu of live testimony.

Aguero's declaration indicated that on July 15, 2011, the day before the homicide, cell phone data showed that the phone used by Petitioner's cousin, Peter Moore, was situated within the geographic sector of the nearest cell tower that also contained the murder site. Aguero's analysis also showed that on July 16, 2011 a ping was detected from Peter Moore's phone in the sector that contained Peter's house in the City of Colusa.

Peter Moore testified at trial that he had not visited the field that contained the murder site on July 15, 2011. None of the data showed Peter Moore to have actually been in the field that contained the murder site on either July 15th or 16th.

Additionally, Mr. Aguero's declaration showed that cell tower data indicated that on August 11, 2011 Peter Moore's cell phone was in Yuba City, California. On that same day and in the same city an anonymous letter was mailed to law enforcement by the bomber. Aguero's declaration further showed that on the next day, August 12, 2011, Peter Moore's cell phone was in the vicinity of the City of Colusa when a second anonymous letter was mailed from that city.

At trial, the defense suggested that Peter Moore was the actual builder and placer of the bomb in the control panel. The defense suggested that Peter had informed others at the ranch that the rice was not in a good condition and needed attention knowing that Roberto Ayala would have to go out and investigate and possibly irrigate the rice fields. Defense also suggested that Peter was the individual observed by Fabian Ayala at the time of the explosion. The cell data in question here does not place Peter Moore at the scene of the explosion on the date of the crime. It does not put Peter in the same rice field or even on the ranch. The cell data does not put Peter Moore in the same sector of the nearest cell tower's reach at any time on July 16, 2011, the date of the murder. The data merely shows that on the 16th Peter Moore was in the same sector as that which contains his home. The data for July 15, 2011 places Peter Moore somewhat closer to the rice field in question but again does not show Peter even being on the ranch much less out in the rice field. Such evidence does little or nothing to bolster the speculation underlying the defense assertion that Peter was the person reportedly seen by Fabian.

The data regarding Peter Moore's cell phone being in Yuba City on the same day one of the anonymous letters was mailed from that town is also of marginal probity. Yuba City is the closest large town to Colusa. The coincidence that Peter Moore's phone was in that town on that day signifies nothing more than at some point in a 24 hour day he, along with thousands of other persons, was in the same broad geographic area as the location of mailing of the anonymous letter. The data doesn't place Peter at or in the vicinity of a post office and does nothing to show that he mailed anything. Similarly, the cell data that establishes that Peter Moore was in Colusa on August 12, 2011 when the second anonymous letter was mailed is of even less evidentiary value since Peter Moore lives in

19

the City of Colusa and can be expected to be in that town at most times.

Beyond the fact that the cell data is intrinsically valueless to implicate Peter Moore, there is the fact that the petitioner has utterly failed to show that trial counsel's failure to present such evidence was anything other than a reasonable tactical decision. There is no declaration from counsel on this point and she was not questioned about it at her testimony on habeas. In such a situation the presumption is that the decision was a reasonable and competent decision. (*Harrington v. Richter*, supra, 562 U.S. at pp. 103-105. The Court concludes that omission of cell tower data was a reasonable and competent tactical decision by trial counsel under the applicable objective standard.

### 2. Automotive Expert

Petitioner claims that trial counsel was ineffective because she failed to call an automotive expert to refute the notion that Fabian moved the pickup truck forward 11 feet after the explosion. The significance of this evidence is asserted to be that if Fabian didn't move the truck, then someone else did. Defense speculated that that someone else had to be Peter Moore, the real bomber under the defense scenario. This speculation is given despite the fact that at trial and in the evidentiary hearings the Petitioner failed to present any evidence placing Peter Moore at or near the scene of the murder at the time of the explosion. Indeed, the cell phone evidence discussed above, if anything, showed Peter to be at home around the time of the bombing.

Petitioner's automotive expert, Sean Shideh, presented testimony that was far from conclusive on the issue of whether Fabian could have moved the pickup. Shideh never examined or met with Fabian Ayala to determine his capabilities at the time of the murder. Instead he relied on broad assumptions about the capabilities of the average seven year old boy and mechanical observations about what it would take to force shift a pickup from "Park" to "Drive" through "Neutral" and back again. His analysis took no account of the excited state of this seven year old who had just seen his father killed and immolated and had sufficient strength and stamina to run two miles cross country seeking help. Shideh apparently did not consider the possibility that the child had slid down the seat to reach the brake pedal while shifting gears obviating the need for a forced shift. Instead the expert relied on Fabian's testimony at trial that he did not move the pickup even though closer in time to the murder Fabian told investigators that he had tried to drive the truck.

Beyond the deficiencies noted above, Petitioner failed to present any evidence that it would have been necessary to move the pickup 11 feet in order for another vehicle to leave the scene. The omission of evidence on this score completely undercuts any relevance the automotive expert's testimony could have had.

Adding to this mixture of unsupported conjecture and speculation regarding the movement of the pickup is that fact that the primary

actor is a seven year old child who was in a highly excited state and who, at various times, presented two versions of what he did. To say that his credibility is suspect is perhaps belaboring a point. It should be noted, however, on the issue of credibility, that we know from the trial testimony that Fabian did, in fact, run to find help. That fact is undisputed. It is illogical to assume that Fabian would run two miles cross country if he could have much more easily turned to a nearby individual, the person he later said he believed he saw in the distance. The only reasonable explanation for Fabian's action is that he did not actually see anyone close by and that this recollection is the product of his excited state at the time of the incident. What the evidence shows instead, is that Fabian exercised the only real option he had which was to get help by running across the rice fields.

The defense suggestion that Peter Moore was at or near the bombing scene at the time of the explosion is highly speculative. This speculation does not survive close scrutiny: the cell phone data does not place Peter there. No witnesses place Peter there. And, the logic of a self-actuated explosive device argues against Peter being there if he were the perpetrator.

The attempt to use the unexplained movement of the pickup truck after the explosion to bolster the idea that someone else was at the scene beside the victim and Fabian is fraught with problems of logic and proof as detailed above. Under these circumstances, competent trial counsel could well conclude that inviting a close technical examination of the physical evidence surrounding the movement of the pickup truck, the existence of a third party at the scene, or Fabian's reliability as an observer of the incident would likely undercut the point the defense was trying to make. A far more effective tactic, and the one Ms. Parisi chose, may well have been to simply cross examine a sympathetic child witness on his recollection of event and then speculate from that testimony.

The fact that Ms. Parisi now states that she had no reason not to present the testimony of an automotive expert is not determinative. The standard is whether it is objectively reasonable for trial counsel to omit the proffered evidence. Here, the Court finds that competent trial counsel could conclude that presentation of the automotive expert would damage the defense case by highlighting the above described evidentiary gaps and logic problems associated with the assertion that Peter was present at the time of the bombing. Presentation of the evidence urged by Petitioner does not establish that a more favorable result would have occurred.

### 3. Forensic Paper and Ink Expert

Petitioner asserts that trial counsel was ineffective for failure to present experts to counter forensic evidence produced by the prosecution regarding comparisons between the paper, ink, and label stock found during the search of Petitioner's house and those same items as they existed in the anonymous letters received from the bomber. Petitioner presented testimony from the expert witness, Larry Steward, on this score.

In his testimony, Stewart was highly critical of the methodology and conclusions asserted by two of the prosecution's forensic experts.

The first prosecution expert in question, Joseph Stevens, conducted a forensic chemical analysis of the paper stock found in Petitioner's house and compared it to the paper used in the anonymous letter. Stevens concluded that the papers from both sources were "chemically indistinguishable." Stewart asserted that Stevens' testing used an outdated chromatography technology and that there were other tests that could have been done in the prosecution analysis. Stewart asserted that a defense expert could have refuted Stevens['] conclusion that the paper stock and the letters were indistinguishable. Stewart did not conduct any testing and did not testify that Stevens' conclusions were actually wrong. The closest Stewart got to an empirical contradiction to the prosecution expert was to point out an alleged inconsistency contained within Mr. Stevens['] testing results.

The critique by Stewart regarding analysis of the printer ink on the anonymous letters compared to the ink found at Petitioner's home is even less probative. Stewart did not dispute that the inks were the same. Stewart only noted that the ink in question was considerably more common than Stevens indicated in his testimony.

Finally, Stewart took issue with the prosecution expert, Amy Michaud, who testified that the labels used to render text in the anonymous letters could have been produced from the same label stock found in Petitioner's home. Michaud's opinion was based on a visual comparison only. Steward was highly critical of this methodology and he indicated that other testing including chemical analysis should have been done.

When asked why she did not call counter experts or have rival defense forensics performed, trial counsel indicated that she had consulted with defense experts on these issues. Her decision not to present warring experts and instead rely on cross examination was an informed decision indicative of reasonable trial tactics.

Overarching these decisions on whether to present counter experts is the fact that the forensic evidence to be countered here was of little weight. Irrespective of whether the paper or ink found in the home was the same as that used in the anonymous letters, the fact remains that in the room where the paper and ink were located was an imprint of a bomb diagram identical to the diagram sent by the bomber to law enforcement. In other words, the forensic minutiae that Petitioner claims should have been directly countered is completely overshadowed by the proverbial smoking gun of the bomb diagram imprint lying on Petitioner's dining room table.

The experts presented by the prosecution added little to the State's case. Whether the paper, ink, or labels match is of little consequence when a virtual copy of the bomb diagram is top of the stack on Petitioner's table.

22

1

2

3

4

5

6

> The Court concludes that failure to present counter experts to the paper, ink, and label forensic evidence of the prosecution was a reasonable tactical decision made by defense counsel after consultation with qualified defense experts. Further, the forensic evidence in question here added little to the weight of the prosecution's case since much more forceful and conclusive evidence was located in the same room, namely the bomb diagram imprint. Under these circumstances, failure to present counter experts does not support a conclusion that a more favorable result would have occurred but for counsel's omission.

7 ECF No. 51-38 at 4-10. These ineffective assistance claims were subsequently rejected by the

8 state appellate court, ECF No. 52-25, and the California Supreme Court, ECF No. 52-42.

9      A "doubly" deferential standard governs a federal habeas petitioner's claim of ineffective

10 assistance of counsel. *See Richter*, 562 U.S. at 105. On direct appeal, the two-step inquiry from

11 *Strickland v. Washington* guides the analysis for an ineffective-assistance-of-counsel claim. *See*

12 466 U.S. 668, 687 (1984). First, a criminal defendant must show some deficient performance by

13 counsel that is "so serious that counsel was not functioning as the counsel guaranteed the

14 defendant by the Sixth Amendment." *Id.* Second, the defendant must show that the deficient

15 performance caused him prejudice, which requires "showing that counsel's errors were so serious

16 as to deprive [the petitioner] of a fair trial." *Id.* On habeas review, coupled with § 2254(d)'s

17 fairminded jurist standard, the *Strickland* requirements become even more deferential: the

18 question is "whether there is *any* reasonable argument that counsel satisfied *Strickland*'s

19 deferential standard." *Richter*, 562 U.S. at 105 (emphasis added). That is, if there is even one

20 reasonable argument that counsel did not violate the *Strickland* standard—even if the state court

21 has not identified such argument—the petitioner cannot obtain habeas relief. *See id.* at 106.

22      Here, a fairminded jurist could agree with the state court's reasoning. The cellular data

23 had low probative value because, as the state court noted, it did not definitively place Peter at the

24 site of the murder. The automotive evidence, similarly, relied on a speculative theory for which

25 there was little evidence: that another person, namely Peter Moore, was present at the site of the

26 murder. And as the state court persuasively noted, the matter of whether the paper or ink in

27 petitioner's home matched the anonymous letters was wholly overshadowed by the presence of

28

1  the bomb diagram imprint on petitioner's table—an obstacle that petitioner's briefing has not

2  adequately addressed.  Again, the question is not whether this court would have reached the same

3  conclusion as the state court, but whether any reasonable argument supports the rejection of

4  petitioner's claim.  Here, the state court's determination was not unreasonable, and petitioner's

5  contention that proceedings might have been different if one or more of these experts had been

6  called is insufficient to warrant habeas relief.  "It is not enough for the defendant to show that the

7  errors had some conceivable effect on the outcome of the proceeding."  *Strickland*, 466 U.S. at

8  693.

9  c.  **Cumulative Error**

10  Petitioner's last claim is that the cumulative impact of the foregoing errors violated his

11  rights.  Respondent argues that this claim is unexhausted because it was not explicitly presented

12  to the California Supreme Court.  ECF No. 50 at 35.  Regardless, it would fail even if it were

13  exhausted because petitioner's individual claims of error are non-meritorious.  *See United States*

14  *v. Franklin*, 321 F.3d 1231, 1241 n.4 (9th Cir. 2003) ("Because no individual errors underlying

15  [Franklin's] convictions have been demonstrated, no cumulative error exists.").

16  Based on the foregoing, it is RECOMMENDED that the petition, ECF No. 44, be

17  DENIED.

18  These findings and recommendations are submitted to the United States District Judge

19  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days of

20  service of these findings and recommendations, any party may file written objections with the

21  court and serve a copy on all parties.  Any such document should be captioned "Objections to

22  Magistrate Judge's Findings and Recommendations," and any response shall be served and filed

23  within fourteen days of service of the objections.  The parties are advised that failure to file

24  objections within the specified time may waive the right to appeal the District Court's order.  *See*

25  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

26  1991).

27

28

24

1

2    IT IS SO ORDERED.

3

4    Dated:    December 3, 2025

5

JEREMY D. PETERSON
UNITED STATES MAGISTRATE JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

25